UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
(electronically filed)

UNITED STATES OF AMERICA

                                                                PLAINTIFF

VS.                                      CRIMINAL ACTION NO. 3:22-CR-89-CHB

CHARLES JERMAINE GORE                                         DEFENDANT

OBJECTIONS TO MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Comes the Defendant, Charles Jermaine Gore, through counsel, and pursuant to 28

U.S.C. § 636 (b) (1) (c) objects to the Magistrate Judge's Report and Recommendation.

**Search Warrant Affidavit Not Supported by Probable Cause**

The Report and Recommendation concluded that the search warrant affidavit "contains

***significant detail*** regarding Gore's activity from July of 2021 to January of 2022." (emphasis

added) [Report and Recommendation, DN-40, p. 10.] However, later, it states, "Admittedly gaps

in Detective Pfeiffer's Affidavit exist, such as the ***lack of evidence regarding Gore's activity***

***from October 22, 2021 to January 31, 2022***, and ***Gore's whereabouts for the five hours***

between him leaving his residence on January 31, 2022 and the failed traffic stop and accident."

(emphasis added) [Report and Recommendation, DN-40, p. 13.]

There is substantial dissonance between these statements. The second statement means

the affidavit contains information *only* from July 21, 2021, to October 22, 2021—a three-month

period, not a six-month period, and that there was a gap of more than three months between that

time and the search. It cannot then be true that that affidavit contains "significant detail regarding

Gore's activity from July of 2021 to January of 2022." Moreover, the affidavit contains no information about what occurred during the five-hour gap between when Gore left his family home and when he was stopped by police, which destroys the nexus of his home and the contraband found in his vehicle five hours later. That contraband could have been obtained from any number of other places during a five-hour period. These facts were acknowledged but erroneously disregarded in the probable cause determination, leading to the wrong conclusion that probable cause existed.

The abundance of text in the affidavit must not be conflated with a wealth of information. The affidavit is lengthy, but when examined closely, information linking drug activity to Gore's family home is plainly lacking. When distilled to its essence, the information in the affidavit connected to the MacDonald home is thus:

1. Gore's rental vehicle was parked in the driveway of his MacDonald home on September 19, 2021.[1] (DN 33-1, ¶ 21).

2. Gore left his MacDonald home with his children and dropped them off at school and daycare on September 21, 2021. (DN 33-1, ¶ 22).

3. Police installed a tracker device on Gore's rental vehicle at his MacDonald home on September 23, 2021. (DN 33-1, ¶ 25).

4. Gore left 11509 Semillon Lane, stopped by his MacDonald home for six (6) minutes, and then left for Atlanta on September 24, 2021.[2] (DN 33-1, ¶ 26).

5. Gore's rental vehicle was observed at his MacDonald home on September 30, 2021. (DN 33-1, ¶ 30).

---

[1] September 19, 2021, is the first mention of 718 MacDonald Rd. in the search warrant affidavit.
[2] There was no allegation that Gore picked up any contraband at Semillon Lane, just that he was observed leaving.

6. On October 1, 2021, police installed a tracker device on Gore's rental vehicle at his MacDonald home. (DN 33-1, ¶ 29).

7. On October 8, 2021, Gore went to the mall, where he stayed for about an hour, and then took his shopping bags to his MacDonald home. (DN 33-1, ¶ 32).

8. On October 8, 2021, Gore left his MacDonald home and arrived at Semillon Drive address, where he unloaded a backpack and suspected weapon, entered the house, and then left the house shortly thereafter with two different backpacks and no apparent weapon.[3] (DN 33-1, ¶ 34).

9. Gore left 11509 Semillon Lane, allegedly conducted a hand-to-hand transaction at a Dairy Queen, and then drove to his MacDonald home on October 12, 2021. (DN 33-1, ¶ 37).

10. Gore exited his MacDonald home and walked to his rental car on January 29, 2022. The affidavit alleges that the grainy pole camera footage shows he returned to the home with "the silhouette of a suspected handgun." (DN 33-1, ¶ 42).

11. Gore exited his MacDonald home and left in his rental vehicle at 2250 on January 30, 2022. He was stopped by police five (5) hours later at 0347 on January 31, 2022. (DN 33-1, ¶ 43).

The affidavit contains 11 references to the MacDonald home, but references 1-7 above merely establish that Gore lived at the MacDonald home. There is no information regarding weapons or drugs at the location—just that he or his vehicle were observed there or that tracker devices were installed on his vehicles there.

---

[3] There is no allegation that he returned to his MacDonald home afterwards with the backpacks.

On October 8, 2021, Gore allegedly took a weapon from his car into the Semillon house. But there was no information that it came from the MacDonald home or that he returned to the MacDonald home with items from the Semillon location. Similarly, there is no information that Gore entered his MacDonald home with drug proceeds or any other contraband after the alleged drug transaction at Dairy Queen on October 12, 2021, just that tracker data showed he returned to his home.[4] All of this information was obtained from late September to mid-October 2021—three and a half months before the search.

The next time that the MacDonald home was referenced in the affidavit was not until January 29, 2022. Gore was captured on pole camera footage exiting his house in the very early hours of the morning and retrieving something from his car. It is not clear from the grainy footage, however, whether the item was a handgun, as alleged, or some other item. While Gore might have been observed with firearms at other locations, this was the only alleged firearm possession connected to his home on MacDonald, and it was exceedingly questionable given the poor visibility on the camera, making it impossible to establish whether it was a gun and not some other object.

Very late the next night, Gore was observed leaving his MacDonald home (with no allegation he was observed with a gun or drugs). Five hours later, he was found with contraband after the accident. There was no information about where he had been between when he left his home and the accident or from where this contraband might have come.

---

[4]The United States speculates that Gore presumably returned to his home with drug proceeds, but as detailed above, there are no specific facts in the affidavit supporting this presumption. [DN-33, p. 12.] Indeed, while the affidavit references searching Nicholas Richert after following him from the Dairy Queen where he allegedly engaged in a drug transaction with Gore, there is, conspicuously, no information that Richert received the drugs police found on him from Gore. [DN-33-1, ¶38.]

The totality of this information is thin and fails to establish the requisite nexus between Gore's residence and the evidence sought. The Sixth Circuit has never held that a suspect's "status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." United States v. Frazier, 423 F.3d 526, 533 (6th Cir. 2005). The Report and Recommendation concludes that, "Detective Pfeiffer's experience and knowledge that drug traffickers commonly possess and store firearms in their residences, constitutes 'some reliable evidence connecting [Gore's] ongoing criminal activity to [his] residence.'" [Report and Recommendation, DN-40, p. 13.] It is unclear how this generic statement of this police officer's purported experience and knowledge is reliable evidence connecting Gore's criminal activity to his residence. Instead, it seems that it is this statement, coupled with Gore's prior criminal history, that is most heavily considered while the dearth of facts establishing a nexus is ignored. As the Sixth Circuit noted in United States v. Brown, "In sum, our cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." 828 F.3d 375, 834 (6th Cir. 2016).

The Brown decision provides guidance about specific potential evidence or corroboration that might ordinarily be seen in a search warrant affidavit but was missing. This included evidence that the defendant distributed narcotics from his home, that the home was used to store narcotics, that any suspicious activity took place at the home, that any reliable confidential informant had purchased drugs there, or recorded phone conversations linking drug trafficking to the home. Brown, *supra*, at 382. Significantly, none of that evidence or corroboration was present in the affidavit in this case. The Report and Recommendation cites United States v.

Allen, 211 F.3d 970, 975 (6th Cir. 2000), for the proposition that the affidavit is judged on what it contains and not what it lacks. [Report and Recommendation, DN-40, p. 13.] But juxtaposing what is lacking to what was included makes it clearer how inadequate the information contained in the affidavit was. Sixteen years after Allen was decided, the Sixth Circuit specifically articulated and considered what was missing in the affidavit in Brown, demonstrating that it is appropriate and instructive to consider what information is lacking in a search warrant affidavit.

A careful review of the search warrant affidavit's references to 718 MacDonald Rd. and Sixth Circuit case law reveals that there is not sufficient evidence to establish the required nexus to support probable cause. Because the search warrant for 718 MacDonald was not supported by probable cause and because the good-faith exception articulated in United States v. Leon, 468 U.S. 897 (1984), (discussed below) does not apply, the conclusions of the Report and Recommendation are erroneous.

### The United States v. Leon Good-Faith Exception Does Not Apply

The Report and Recommendation erroneously concluded that even if the District Court found the search warrant affidavit in this case lacked probable cause, the good-faith exception to the exclusionary rule, articulated in United States v. Leon, supra, would apply. [Report and Recommendation, DN-40, p. 16.] Further, it concluded that none of the circumstances barring use of the exception, as articulated in United States v. Thomas, 605 F.3d 300, 11 (6th Cir. 2010), apply in this case. [Report and Recommendation, DN-40, pp. 14-16.] However, two of these circumstances do apply, rendering the good-faith exception inapposite.

First, the issuing magistrate abandoned his neutral and detached role and served as a rubber stamp for police activities, precluding application of the good-faith exception. In Gore's separately filed Motion to Compel Production of Names of Judges Singled Out in DOJ Report of

LMPD Investigation, he requested that the Court compel production of the names of the six judges the Department of Justice determined approved more than half of the search warrants in the sample of cases examined in its investigation of Louisville Metro Government and LMPD. [DN-31.] On information and belief of undersigned counsel—Hon. McKay Chauvin—was one of those judges, and he approved the search warrant of Gore's home at 718 MacDonald. [DN-37, p. 3.]

In opposing the Motion to Compel, the United States argued that there was no evidence that the signing judge acted as a partisan rubber stamp. [DN-34, p. 5.] It also argued—in support of denying the Motion to Compel—that Gore failed to carry his burden of proving the judge who signed the search warrant in his case acted as a rubber stamp. Id. Unfortunately, that information is in the hands of the government and the government alone, and Gore's Motion to Compel was denied.[5] [DN-39.] The undeniable implication of the majority of warrants being signed by just 20% of the available judges is that law enforcement preferred those six judges, knowing that they would be more likely to approve the warrant request. LMPD did not adhere to its randomized schedule for judges to approve search warrants, which—in and of itself—demonstrates a lack of neutrality and detachment between LMPD and the six judges who approved more than half of the warrants reviewed. As established above, there is not sufficient evidence to establish the required nexus to support probable cause. Even the magistrate judge concluded the connection was "tenuous." [Report and Recommendation, DN-40, p. 12.] This weak case for a search warrant coupled with likely judge shopping strongly suggests that the issuing magistrate

---

[5] Gore is now being penalized for this lack of evidence, which is held by the government and directly relates to whether the Leon good-faith exception applies. The United States cannot have it both ways: Gore cannot both be denied the evidence requested to support his argument *and* be penalized for failing to produce the same evidence he requested but was denied.

abandoned his neutral and detached role and served as a rubber stamp for police activities. Therefore, the good-faith exception should not apply.

In Leon, the Court held, "The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo–Ji Sales, Inc. v. New York, 442 U.S. 319 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Brown v. Illinois, 422 U.S., at 610–611; *see* Illinois v. Gates, *supra*, 462 U.S., at 263–264. "[T]he courts must also insist that the magistrate purport to 'perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police.'" Leon, 468 U.S. at 914, *citing* Aguilar v. Texas, 378 U.S. 108, 111 (1964) (*abrogated by* Illinois v. Gates, 462 U.S. 213 (1983); Illinois v. Gates, *supra*, 462 U.S., at 239; *see also* Thomas, *supra*, 605 F.3d, at 11. Accordingly, the good-faith exception is inapposite in this case.

Secondly, the good-faith exception should not apply because the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable. There was no evidence contained in the affidavit that justified a search of Gore's home. "Because we conclude that the warrant failed to establish any nexus whatsoever between the residence to be searched and the criminal activity attributed to the defendant in the affidavit, we conclude that the district court's reliance on Leon cannot be sustained." U.S. v. Laughton, 409 F.3d 744, 746 (6th Cir. 2005). The Report and Recommendation erroneously concluded that this instance does not apply and that therefore the good-faith exception does apply.

The Leon good-faith exception to the exclusionary does not apply for the reasons articulated, contrary to the Report and Recommendations. Because the search warrant affidavit is not supported by probable cause and the good-faith exception does not apply, the fruits of the search must be suppressed.

WHEREFORE, Mr. Gore respectfully requests that the physical evidence and statements obtained as a result of the search at 718 MacDonald Road on February 9, 2022, be suppressed.

Respectfully submitted,
s/Rob Eggert
Counsel for Charles Jermaine Gore

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

s/Rob Eggert
Counsel for Charles Jermaine Gore